**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

ESTATE OF TYRONE MILES, JR., CASE NO.: 2:23-cv-14302-MOORE

Plaintiff,

v.

DEPUTY SAMUEL KIMMEL, individually and in his official capacity; and DEPUTY WILLIAM BROWN, individually and in his official capacity.

Defendants.
_______________________________________/

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

COMES NOW, Plaintiff, the Estate of Tyrone Miles, JR., and files its FIRST AMENDED COMPLAINT against the Defendants, DEPUTY SAMUEL KIMMEL and DEPUTY WILLIAM BROWN, both individually and in their official capacities as deputy sheriffs of the Martin County Sheriff's Office, and alleges as follows:

**PARTIES**

1. Plaintiff, the Estate of TYRONE MILES, JR. is represented by Tyrone Miles, Sr., who has been duly appointed as the Personal Representative of the Estate of Tyrone Miles, Jr.
2. Defendant DEPUTY SAMUEL KIMMEL, at all material times hereto, was and is a deputy sheriff of the Martin County Sheriff's Office, and upon information and belief is a resident of Florida and is sued in his individual capacity and official capacity as a deputy sheriff of the Martin County Sheriff's Office.
3. Defendant DEPUTY WILLIAM BROWN, at all material times hereto was and is a deputy sheriff of the Martin County Sheriff's Office, and upon information and belief is a resident

of Florida and is sued in his individual capacity and official capacity as a deputy sheriff of the Martin County Sheriff's Office.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 USC §1331, as this case presents a federal question arising under the Constitution and laws of the United States, specifically 42 USC §1983, which provides a cause of action for deprivation of constitutional rights under color of state law. This Court also has jurisdiction pursuant to 28 USC §1343, which grants district courts original jurisdiction over civil actions to redress the deprivation of rights secured by the Constitution or federal law.
5. This Court has personal jurisdiction over Defendant KIMMEL because he is a resident of Florida and was at all material times employed as a Deputy Sheriff in Martin County, Florida.
6. This Court has personal jurisdiction over Defendant BROWN because he is a resident of Florida and was at all material times employed as a Deputy Sheriff in Martin County, Florida.
7. This Court is the proper venue for this case pursuant to 28 USCS §1391, as a substantial part of the events giving rise to the claims occurred in Martin County, Florida, which is within the Southern District of Florida, Fort Pierce Division.

## FACTUAL ALLEGATIONS

8. On February 7, 2023, at approximately 2:00 a.m., Defendant KIMMEL, while in a marked Martin County Sheriff's Office patrol vehicle, activated his police lights and attempted to conduct a traffic stop of a vehicle being driven by TYRONE MILES, JR. based on information received from the Miami Gardens Police Department about a stolen vehicle.

9. While MILES did not stop, Defendant KIMMEL reported that the vehicle being driven by MILES was the vehicle that had been reported as stolen in Miami-Dade County. Defendant KIMMEL then initiated a pursuit of MILES' vehicle as it exited I-95 at the Indiantown Avenue exit ramp.

10. Defendant KIMMEL briefly broke off the pursuit and proceeded to SW Warfield Boulevard with other deputies, where he spotted MILES' vehicle and radioed its position heading back north towards Indiantown Avenue, before Defendant KIMMEL resumed pursuit of the vehicle.

11. As Defendant KIMMEL continued his pursuit of MILES, MILES crossed the road median going north in the southbound lanes.

12. Despite the dangerous conditions, Defendant KIMMEL continued the high-speed pursuit as both vehicles continued on SW Indiantown Avenue before turning west onto SW Kanner Highway.

13. Following a failed attempt with other deputies to stop MILES' vehicle with a tire deflation device, Defendant BROWN joined the high-speed pursuit of MILES in a marked vehicle behind Defendant KIMMEL's vehicle.

14. As a result of Defendant KIMMEL and BROWN's continued pursuit, MILES lost control of the vehicle, which veered off the road on the north side of SW Kanner Highway, crashing adjacent to the St. Lucie Canal.

15. After MILES' vehicle had already crashed, Defendant KIMMEL accelerated into the rear of MILES' vehicle, initiating a "vehicle immobilization technique" by ramming his push bumper into the rear bumper of MILES' vehicle.

16. Defendant KIMMEL then exited his vehicle as if to pursue MILES on foot through the large brush near the canal, obscuring his body camera as he did so.

17. Seconds behind Defendant KIMMEL, Defendant BROWN pulled up alongside the vehicle's driver's side and yelled a command with his gun drawn. Defendant BROWN also exited his vehicle as if to pursue MILES on foot into the dangerous brush near the canal.

18. At no material time did MILES pose an immediate threat of harm to Defendants KIMMEL and BROWN or to any other person.

19. Outside of visual or radio contact with Defendant BROWN, Defendant KIMMEL waited by the abandoned vehicle, with a weapon drawn, until Defendant KIMMEL turned off his body camera's audio before he entered the grassy area near the canal at approximately 2:58 a.m.

20. Upon information and belief, during the time when the camera was obscured and the audio was off, there was a struggle going on between the officers and MILES.

21. The results of the autopsy report attached as "EXHIBIT A", conducted by private medical examiner Dr. William Anderson, show that MILES was subjected to physical beating and bruising, which led to his death. Dr. Anderson's report ultimately concludes that MILES's death was a result of homicidal drowning.

22. While Defendant KIMMEL subsequently turned the audio on his body camera back on, he nevertheless obscured the video while he and Defendant BROWN discussed an apparent footprint found along the canal.

23. Defendants called off the search for MILES at approximately 5:00 a.m.

24. On February 10, 2023, at approximately 11:00 a.m. – three days after Defendants KIMMEL and BROWN pursued MILES – MILES' dead body was recovered from the St.

Lucie Canal. MILES' body was only found because his father, TYRONE MILES SR., called in a missing person's report, which pressured the Sheriff's office go out and look once again.

25. The County Medical Examiner's office concluded MILES' cause of death was accidental drowning.

26. However, an independent and more thorough forensic medical examination attached as "Exhibit A" revealed that MILES sustained multiple blunt force traumatic injuries to his upper arms, wrists, right hand, left lower thigh, knee, and upper foreleg, and suffered an acute spinal cord injury, all consistent with attempts of excessive restraint.

27. Additionally, the independent forensic medical examination revealed that MILES sustained pulmonary edema and congestion, which is common in drowning cases.

28. The independent forensic pathologist concluded that MILES' cause of death was pulmonary edema and congestion from drowning, complicated by unexplained compressive-type blunt force injury of the upper and lower extremities, suggesting homicidal drowning.

29. As a direct and proximate result of the life-threatening and debilitating injuries caused by the Defendants, MILES died in the St. Lucie Canal on February 7, 2023.

30. By their deliberate indifference, Defendants KIMMEL and BROWN encouraged and caused and/or acquiesced in the beating and/or drowning death of MILES.

31. Defendant KIMMEL exposed MILES to an unreasonably high risk of fatal harm when he forced him to crash into the St. Lucie Canal and then drove him further into the St. Lucie Canal in his attempts to restrain him.

32. Defendant KIMMEL exposed MILES to an unreasonably high risk of fatal harm when he failed to undertake reasonable efforts to prevent MILES from entering the St. Lucie Canal, which he himself claimed was too dangerous for him to venture into.

33. Once MILES entered the canal, Defendant KIMMEL failed to act swiftly to prevent him from getting too far out across the canal to be saved.

34. Defendant KIMMEL made a conscious decision to do nothing to save MILES from the mortal danger to which Defendant KIMMEL had unreasonably and unconscionably exposed him.

35. Defendant BROWN exposed MILES to an unreasonably high risk of fatal harm when he forced him to crash into the St. Lucie Canal and then drove him further into the St. Lucie Canal in his attempts to restrain him.

36. Defendant BROWN exposed MILES to an unreasonably high risk of fatal harm when he failed to undertake reasonable efforts to prevent MILES from entering the St. Lucie Canal, which was known to be dangerous.

37. Once MILES entered the canal, Defendant BROWN failed to act swiftly to prevent him from getting too far out across the canal to be saved.

38. Defendant BROWN made a conscious decision to do nothing to save MILES from the mortal danger to which Defendant BROWN had unreasonably and unconscionably exposed him.

39. The injuries that MILES suffered from Defendants KIMMEL and BROWN's attempts to restrain and incapacitate him put him in the mortal danger that was the direct and proximate cause of his death.

**COUNT I**
**VIOLATION OF FOURTH AMENDMENT RIGHTS OF EXCESSIVE FORCE UNDER 42 USC §1983**
(against Defendant SAMUEL KIMMEL in his individual and official capacities)

40. Plaintiff realleges and reaffirms all of the allegations contained in paragraphs 1 through 39, and further alleges as follows:

41. At all times material hereto, Defendant KIMMEL used excessive force under the color of state law when he pursued, stopped, and attempted to arrest MILES on February 7, 2023, in violation of Miles' constitutionally protected rights under the Fourth Amendment of the United States Constitution.

42. Defendant KIMMEL was acting in his capacity as Deputy Sheriff of the Martin County Sheriff's Office and under the color of state law when he pursued, forced MILES car off the road near the St. Lucie Canal, and attempted to arrest MILES on February 7, 2023.

43. Defendant KIMMEL used excessive force when he rammed his police vehicle into MILES' already crashed vehicle, and when he pursued MILES on foot into a dangerous area near the St. Lucie Canal.

44. At no material time did MILES pose an immediate threat of harm to Defendants KIMMEL and BROWN or to any other person.

45. Outside of visual or radio contact with Defendant BROWN, Defendant KIMMEL waited by the abandoned vehicle, with a weapon drawn, until Defendant KIMMEL turned off his body camera's audio before he entered the grassy area near the canal at approximately 2:58 a.m.

46. Upon information and belief, during the time when the camera was obscured and the audio was off, there was a struggle going on between the officers and MILES.

47. Upon information and belief, Defendant KIMMEL used excessive force during the course of his pursuit and attempted apprehension of MILES, in that he assaulted and forcibly beat him, resulting in the multiple blunt force traumatic injuries documented by the independent forensic pathologist.

48. Defendants KIMMEL and BROWN inflicted multiple blunt force traumatic injuries to MILES' upper arms, wrists, right hand, left lower thigh, knee, and upper foreleg, causing him to suffer an acute spinal cord injury, all consistent with attempts of excessive restraint. The force used by Defendant KIMMEL was objectively unreasonable under the circumstances and violated MILES' clearly established right to be free from excessive force under the Fourth Amendment to the United States Constitution.

49. At no time did MILES pose an immediate threat to the safety of Defendant KIMMEL or others that would justify the level of force used against him.

50. As a direct and proximate cause of Defendant KIMMEL's use of excessive force, MILES suffered multiple and extensive blunt force traumatic injuries, which were the direct and proximate cause of MILES' death in the St. Lucie Canal.

51. The independent forensic pathologist's finding of "homicidal drowning" supports the conclusion that MILES' death was directly caused by Defendant KIMMEL's and BROWN'S actions.

**COUNT II**
**VIOLATION OF FOURTH AMENDMENT RIGHTS OF EXCESSIVE FORCE UNDER 42 USC §1983**
(against Defendant WILLIAM BROWN in his individual and official capacities)

52. Plaintiff realleges and reaffirms all of the allegations contained in paragraphs 1 through 39, and further alleges as follows:

53. At all times material hereto, Defendant BROWN used excessive force under the color of state law when he pursued, stopped, and attempted to arrest MILES on February 7, 2023, in violation of Miles' constitutionally protected rights under the Fourth Amendment of the United States Constitution.

54. Defendant BROWN was acting in his capacity as Deputy Sheriff of the Martin County Sheriff's Office and under the color of state law when he pursued, forced MILES car off the road near the St. Lucie Canal, and attempted to arrest MILES on February 7, 2023.

55. Defendant BROWN used excessive force when he approached MILES' vehicle with his weapon drawn, and when he pursued MILES on foot into a dangerous area near the St. Lucie Canal. The St. Lucie Canal is known to be inhabited by alligators, snakes, and other wild animals.

56. Upon information and belief, Defendant BROWN used excessive force during the course of his pursuit and attempted apprehension of MILES, in that he assaulted and forcibly beat him, resulting in the multiple blunt force traumatic injuries documented by the independent forensic pathologist.

57. Upon information and belief, MILES, beating, and injuries occurred outside the recording of the police body cameras and audio when they were turned off. MILES' injuries, as documented by the independent medical examiner, cannot be explained by any other forces other than those of the officers. As a result, Defendant BROWN is directly and proximately responsible for MILE'S untimely death.

58. The force used by Defendant BROWN was objectively unreasonable under the circumstances and violated MILES' clearly established right to be free from excessive force under the Fourth Amendment to the United States Constitution. Indeed, MILES was

unarmed, and none of the officers reported being attacked or being under threat of physical attack by MILES.

59. At no time did MILES pose an immediate threat to the safety of Defendant BROWN or others that would justify the level of force used against him.

60. As a direct and proximate cause of Defendant BROWN's use of excessive force, MILES suffered multiple and extensive blunt force traumatic injuries, which were the direct and proximate cause of MILES' death in the St. Lucie Canal.

61. The independent forensic pathologist's finding of "homicidal drowning" supports the conclusion that MILES' death was directly caused by Defendant BROWN's actions.

62. No other outside independent or natural force was the cause of MILES's injury other than Defendant BROWN.

**COUNT III**
**VIOLATION OF FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS RIGHTS FOR A STATE-CREATED DANGER UNDER 42 USC §1983**
(against Defendant SAMUEL KIMMEL in his individual and official capacities)

63. Plaintiff realleges and reaffirms all of the allegations contained in paragraphs 1 through 39, and further alleges as follows:

64. Defendant KIMMEL was acting in his capacity as a deputy Sheriff of the Martin County Sheriff's Office and under the color of state law when they pursued, stopped, and attempted to arrest MILES on February 7, 2023.

65. Defendant KIMMEL created a dangerous situation by initiating and continuing a high-speed pursuit that caused MILES to lose control of his vehicle near the St. Lucie Canal.

66. Defendant KIMMEL further increased the danger by ramming MILES' already crashed vehicle, driving the vehicle, and driving MILES himself further into the dangerous brush of the St. Lucie Canal, causing him to flee on foot toward the canal.

67. Defendant KIMMEL pursued MILES toward the canal, which they knew or should have known presented a serious risk of drowning.

68. Defendant Kimmel acted with deliberate indifference to a known or obvious danger, as evidenced by his own statement that the area was too dangerous for him to venture into. Indeed, the canal is known to be inhabited by alligators, snakes, and other dangerous wild animals.

69. Despite this knowledge, Defendant KIMMEL pursued MILES toward the canal, driving him deeper into and further toward the dangerous conditions surrounding and in the St. Lucie Canal, and failed to take reasonable steps to prevent him from entering the water or to rescue him once he had entered.

70. By his own statement, Defendant KIMMEL demonstrated his awareness of the danger and his deliberate indifference to it.

71. It was foreseeable that pursuing MILES toward the canal area could result in his entering the water and drowning, exacerbated by MILES' condition following the excessive trauma caused by the Defendants' attempts to incapacitate and apprehend MILES, especially given the time of day (approximately 3:00 a.m.), the darkness, and unfamiliar terrain.

72. Pursuing MILES into the canal was a foreseeable danger, given the warnings posted about the canal.

73. Defendant KIMMEL's decision to pursue MILES toward and into a dangerous canal area and then make little to no effort to save him once he entered the water shocks the conscience and demonstrates a deliberate indifference to his safety and welfare.

74. Defendants' actions shock the conscience, given his sworn duty to protect and preserve life, and fly in the face of his training and the Martin County Sheriff's Department's policies on pursuits near bodies of water.

75. As the subject of Defendant KIMMEL's pursuit, MILES was a foreseeable victim of the danger created by Defendant KIMMEL's actions.

76. It was foreseeable that pursuing MILIES into a dangerous canal in the early hours of the morning in an unlit area, inflicting physical beatings and bruising, and then failing to conduct a thorough search would put him at risk of being harmed.

77. As a direct and proximate cause of the dangerous situation created by Defendant KIMMEL, MILES was driven into the St. Lucie Canal, and, exacerbated by his physical trauma sustained in the defendant's attempt to incapacitate and apprehend MILES, drowned.

78. The conduct of Defendant KIMMEL amounts to a violation of MILES' substantive due process rights.

**COUNT IV**
**VIOLATION OF FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS RIGHTS FOR A STATE-CREATED DANGER UNDER 42 USC §1983**
(against Defendant WILLIAM BROWN in his individual and official capacities)

79. Plaintiff realleges and reaffirms all of the allegations contained in paragraphs 1 through 39, and further alleges as follows:

80. Defendant BROWN was acting in his capacity as a deputy Sheriff of the Martin County Sheriff's Office and under the color of state law when they pursued, stopped, and attempted to arrest MILES on February 7, 2023.

81. Defendant BROWN created a dangerous situation by initiating and continuing a high-speed pursuit that caused MILES to lose control of his vehicle near the St. Lucie Canal.

82. Defendant BROWN further increased the danger by driving adjacent to MILES' already crashed vehicle with his gun drawn, pursuing MILES further into the dangerous brush of the St. Lucie Canal, causing him to flee on foot toward the canal.

83. Defendant BROWN pursued MILES toward the canal, which he knew or should have known presented a serious risk of drowning.

84. Defendant BROWN acted with deliberate indifference to a known or obvious danger as demonstrated by the statements of his fellow officer KIMMEL, who stated that the canal was too dangerous for him.

85. Despite this knowledge, Defendant BROWN pursued MILES toward the canal, driving him deeper into and further toward the dangerous conditions surrounding and in the St. Lucie Canal, and failed to take reasonable steps to prevent him from entering the water or to rescue him once he had entered.

86. It was foreseeable that pursuing MILES toward the canal area could result in him entering the water and drowning, exacerbated by MILES' condition following the excessive trauma caused by the Defendants' attempts to incapacitate and apprehend MILES, especially given the time of day (approximately 3:00 a.m.), the darkness, and unfamiliar terrain.

87. Defendant BROWN's decision to pursue MILES toward and into a dangerous canal area and then make little to no effort to save him once he entered the water shocks the conscience and demonstrates a deliberate indifference to his safety and welfare.

88. Defendants' actions shock the conscience, given his sworn duty to protect and preserve life, and fly in the face of his training and the Martin County Sheriff's Department's policies on pursuits near bodies of water.

89. As the subject of Defendant BROWN's pursuit, MILES was a foreseeable victim of the danger created by Defendant BROWN's actions.

90. As a direct and proximate cause of the dangerous situation created by Defendant BROWN, MILES was driven into the St. Lucie Canal, and, exacerbated by his physical trauma sustained in the defendant's attempt to incapacitate and apprehend MILES, drowned.

**COUNT V**
**VIOLATION OF FOURTEENTH AMENDMENT FOR DELIBERATE INDIFFERENCE UNDER 42 USC §1983**
(against Defendant SAMUEL KIMMEL in his individual and official capacities)

91. Plaintiff realleges and reaffirms all of the allegations contained in paragraphs 1 through 38, and further alleges as follows:

92. Defendant KIMMEL was acting in his capacity as Deputy Sheriff of Martin County Sheriff's Office and under the color of state law when he pursued, stopped, and attempted to arrest MILES on February 7, 2023.

93. Once Defendant KIMMEL caused MILES to crash his car adjacent to the St. Lucie Canal, MILES faced a substantial risk of drowning, especially given the time of day (approximately 3:00 a.m.), the darkness, and the unfamiliar terrain.

94. Defendant KIMMEL further exacerbated the substantial risk posed to MILES by ramming MILES' already crashed vehicle, driving the vehicle further into the dangerous area surrounding the St. Lucie Canal.

95. Defendant KIMMEL was aware of the danger posed by the St. Lucie Canal, as evidenced by his own statement that the area was too dangerous for him to venture into.

96. Further, Defendant KIMMEL was aware of the increased danger that MILES faced as a result of the physical trauma caused to MILES by Defendants in their attempts to incapacitate and apprehend MILES.

97. Defendant KIMMEL was aware that MILES had entered or was at risk of entering the dangerous canal, as evidenced by their discussion of footprints found along the canal.

98. Despite their knowledge of the risk, Defendant KIMMEL made a conscious decision not to take reasonable steps to prevent MILES from drowning.

99. Defendant KIMMEL failed to call for appropriate rescue resources, such as a water rescue team or dive team, despite knowing that MILES was at risk of drowning. MILES' body was only found days later because MILES's father called in a missing person's report.

100. Defendant Kimmel's failure to follow department policies on water rescues and the decision to call off the search despite knowing TYRONE MILES, JR. had not been located constitute deliberate indifference to the substantial risk of harm MILES faced on that morning.

101. As a direct and proximate result of Defendant KIMMEL's deliberate indifference to the substantial risk of harm faced by MILES, he drowned in the St. Lucie Canal.

## COUNT VI
## VIOLATION OF FOURTEENTH AMENDMENT FOR DELIBERATE INDIFFERENCE UNDER 42 USC §1983

(against Defendant WILLIAM BROWN in his individual and official capacities)

102. Plaintiff realleges and reaffirms all of the allegations contained in paragraphs 1 through 39, and further alleges as follows:

103. Defendant BROWN was acting in his capacity as Deputy Sheriff of Martin County Sheriff's Office and under the color of state law when he pursued, stopped and attempted to arrest MILES on February 7, 2023.

104. Once MILES was caused to crash his car adjacent to the St. Lucie Canal, MILES faced a substantial risk of drowning, especially given the time of day (approximately 3:00 a.m.), the darkness, and the unfamiliar terrain.

105. Defendant BROWN further exacerbated the substantial risk posed to MILES by driving adjacent to MILES' already crashed vehicle with his gun drawn, pursuing MILES further into the dangerous brush of the St. Lucie Canal, causing him to flee on foot toward the canal.

106. Defendant BROWN was aware or should have been aware of the danger posed by the St. Lucie Canal.

107. Further, Defendant BROWN was aware of the increased danger that MILES faced as a result of the physical trauma caused to MILES by Defendants in their attempts to incapacitate and apprehend MILES.

108. Defendant BROWN was aware that MILES had entered or was at risk of entering the dangerous canal, as evidenced by their discussion of footprints found along the canal.

109. Despite their knowledge of the risk, Defendant BROWN made a conscious decision not to take reasonable steps to prevent MILES from drowning.

110. Defendant BROWN failed to call for appropriate rescue resources, such as a water rescue team or dive team, despite knowing that MILES was at risk of drowning.

111. As a direct and proximate result of Defendant BROWN's deliberate indifference to the substantial risk of harm faced by MILES, he drowned in the St. Lucie Canal.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and grant the following relief:

A. Compensatory damages against all defendants in an amount to be determined at trial, but in excess of $100,000, for:

1. Medical and funeral expenses;

2. Loss of net accumulation beyond death;
3. Mental pain and suffering from the date of death;
4. Loss of support and services from the date of injury to death, with interest;
5. Future loss of support and services from the date of death; and
6. Loss of father's companionship, instruction, and guidance for MILE's surviving minor child.

B. Punitive damages against defendants in their individual capacities in an amount to be determined at trial.

C. Reasonable attorney's fees and costs pursuant to 42 USC §1988.

D. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## CERTIFICATE OF SERVICE

I, **Byron A. Acosta**, certify that the foregoing was electronically filed with the Clerk of Court via the CM/ECF system, which will send an electronic copy to: **Summer M. Barranco**, Purdy, Jolly, Giuffreda, Barranco & Jisa, P.A., 2455 E. Sunrise Boulevard, Suite 1216, Fort Lauderdale, Florida 33304, Telephone: (954) 462-3200, Summer@purdylaw.com, this 15th day of December, 2025.

s/Byron B. Acosta, Esq.

**EXHIBIT A**

**FORENSIC DIMENSIONS**
MEDICAL DIAGNOSTIC SERVICES--ORLANDO
1630 BRIDGEWATER DRIVE
HEATHROW, FLORIDA 32746
(407) 333-3512

*William R. Anderson MD* *M. A. Raven, RN*

**PVT-23**
**Autopsy Examination**

**REPORT OF FORENSIC DIAGNOSTIC CONSULTATION**

PATIENT: MILES, TYRONE

AGE: 20 SEX: M

DATE/DEATH: 02/10/23 (FOUND) TIME/EXAM: 10:00
DATE/EXAM : 02/17/23 REQUEST/BY: TYRONE MILES, SR.
DATE/REPORT: 05/24/23

ANATOMIC PATHOLOGIC FINDINGS:

1. Blunt Force Injuries (Compressive), upper extremities
   a. acute soft tissue & intra-muscular hemorrhage, upper arms, bilaterally
   b. acute soft tissue hemorrhage, wrists, bilaterally
   c. acute soft tissue hemorrhage, dorsal aspect, right hand

2. Blunt Force Injuries (Compressive), lower extremities
   a. acute soft tissue & intra-muscular hemorrhage, posterior aspect, left lower thigh, knee, and upper foreleg
   b. no demonstrable bony fractures

3. Pulmonary Edema & Congestion
   a. found in water by history

CAUSE OF DEATH:

PULMONARY EDEMA & CONGESTION C/W DROWNING: COMPLICATED BY UNEXPLAINED COMPRESSIVE-TYPE BLUNT FORCE INJURY UPPER AND LOWER EXTREMITIES SUGGESTING HOMICIDAL DROWNING

*william anderson*
WILLIAM R. ANDERSON MD
PATHOLOGIST

**REPORT OF FORENSIC DIAGNOSTIC CONSULTATION**

## GROSS ANATOMICAL EXAMINATION:

The autopsy is performed at the request of Tyrone Miles, Sr. in the DeGusipe Funeral Home, prosector: Dr. William R Anderson, assisted by: Mr. Fred Potts.

**IDENTIFICATION:**

The identification of the body is made by Medical Examiner identification tags & wristband.

**CLOTHING & PERSONAL EFFECTS:**

The victim is wearing the following items of clothing: none

**SCARS, TATTOOS, & SPECIAL FEATURES:**

Examination of the victim shows no significant areas of scarring. Multiple tattoos are identified in the upper extremities. There are no needle tracks or cutaneous needle puncture sites.

**GENERAL STATEMENT:**

The body is that of a normally developed, moderately well-nourished Black male appearing the stated age of 20 years, measuring 73" in length, and weighing 172 lbs. per Medical Examiner report. The body is cool and rigor mortis has passed throughout. There is evidence of moderate post-mortem decomposition, A previous autopsy has been performed.

**EXTERNAL EXAMINATION:**

The hair is black; the eyes are brown with autolysis, and the pupils are dilated equally bilaterally measuring 6 mm in diameter, respectively. The conjunctival membranes exhibit no pallor, petechiae, or icterus. There is no periorbital trauma or edema.

The dentition is natural. There is no trauma to the lips or frenulae. No contusion injuries are present in the facial area. There is no evidence of orofacial trauma.

The neck is normally formed, with no evidence of external trauma or deformities.

The chest is bilaterally symmetrical with no increase in the AP diameter, or width of the intercostal spaces. The breasts are normal male, with no masses or trauma.

The abdomen shows a moderate amount of subcutaneous fat.

Genitalia are normal adult male, with no evident trauma.

The extremities are normally formed, with no evidence of muscle wasting, or edema. (See Description of Injuries.) The skin shows no diffuse or discrete lesions, and no areas of abnormal pigmentation. Moderate amounts of black-colored dirt are noted on the palmar surfaces of the right and left hands.

**SPECIAL PROCEDURES:**

The following special procedures are performed: Toxicology: None; Forensic Analysis: None; Hematology: None; Microbiology: None; Histology: Representative tissue sections are submitted.

**DESCRIPTION OF INJURIES:**

Examination of the upper extremities shows areas of diffuse soft tissue hyperemia and edema involving the lower humeral areas bilaterally and extending into the upper forearm on the right side.

Additionally areas of recent diffuse soft tissue hyperemia and edema are noted in the area of the wrists bilaterally and on the dorsal aspect of the right hand.

Examination of the lower extremities shows an area of diffuse soft tissue hyperemia and edema involving the posterior aspect of the left lower thigh and upper portion of the calf and foreleg. There are no demonstrable bony fractures.

**INTERNAL EXAMINATION:**

HEART:

The heart has been previously dissected. The epicardial surface is smooth, and glistening, with no areas of adhesion. No masses or areas of nodularity or inflammation are identified.

The coronary arteries exhibit a normal anatomic distribution, showing a right dominant circulatory pattern, and are widely patent throughout their length. There are no areas of stenosis or occlusion, and no foci of intramural hemorrhage or acute intraluminal thrombosis are noted.

The left ventricular musculature measures 10 mm. in thickness; the septum measures 15 mm. in thickness, and the right ventricular musculature measures 3-4 mm. in thickness. There is no hypertrophy or dilatation of any cardiac chamber.

Examination of the myocardium on serial transverse sectioning reveals the muscle to be meaty-red, firm and free of localized areas of necrosis or fibrosis on gross examination..

The endocardial surfaces exhibit no foci of subendocardial hemorrhage, no inflammatory processes, and no mural thrombus formation.

The valves are normally formed, showing no vegetations, calcifications, or adhesions. There is no dilatation or stenosis of any valve ring.

PERIPHERAL VASCULAR SYSTEM:

The aorta is intact throughout its length, with the great vessels arising in a normal anatomic pattern. There are no areas of narrowing, and no significant atherosclerosis or aneurysm formation is present.

LUNGS:

The lungs have been previously dissected. The pleural cavities exhibit smooth, glistening surfaces, with no inflammation or areas of adhesion. No petechiae, masses or areas of nodularity or acute inflammation, are present.

The tracheobronchial tree appears patent with no foreign material, and no injection of mucosa of the proximal or distal airways.

The lungs exhibit a normal lobular structure. Palpation reveals a hypocrepitant, edematous parenchyma, with no areas of consolidation, inflammation, or increased tissue density. There is no hyper aeration of the air sacs. No atelectasis is present.

The pulmonary arteries exhibit no significant atherosclerotic changes, and no thromboemboli are present in the peripheral vessels.

No focal or diffuse fibrosis is present. There are no granulomata, masses, or areas of cavitation, and no intraparenchymal hemorrhage. No anthracotic pigment is identified within the pulmonary parenchyma or in the lymph nodes of the perihilar region.

NECK:

There is no trauma to the muscles or cartilage of the larynx. The thyroid gland exhibits symmetrical reddish-brown lobes, with no masses, cysts, or foci of hemorrhage.

GASTROINTESTINAL SYSTEM:

The peritoneal cavity exhibits smooth, glistening surfaces, with no inflammation or areas of adhesion. No petechiae, masses or areas of nodularity or inflammation, are present.

The esophagus has been previously dissected but appears intact throughout its length, with no areas of ulceration, erosion, or perforation. No masses or areas of outpouching are present. The stomach has been previously dissected. The gastric mucosa shows a normal rugal pattern with no areas of hyperemia, erosion or ulceration. The duodenal bulb shows no hypertrophic changes, and no ulceration is present. The remainder of the gastrointestinal tract shows no ulcerations, perforations, or adhesions. No areas of inflammation are present, and there are no masses, or areas of necrosis.

PANCREAS:

The pancreas has been previously dissected and exhibits a tan-brown parenchyma exhibiting a normal lobular pattern, with no hemorrhage, inflammation, fibrosis, calcification, or pseudo cyst formation.

LIVER:

The liver has been previously dissected. The capsular surface is smooth and glistening, with no foci of hemorrhage or fibrosis.

LIVER (CONT'D):

On cut section, the hepatic parenchyma exhibits a normal lobular pattern, with no prominence of the centrilobular areas, and no intra-parenchymal hemorrhage. The parenchyma is tan-brown, with no areas of yellowish coloration. The texture is moderately soft secondary to autolysis, with no areas of grossly identifiable necrosis or bile stasis. There is no fibrosis, cirrhosis, or cyst formation, and no masses are identified.

The gallbladder is present. The wall shows no inflammation, and there is no leakage of bile.

SPLEEN & LYMPHATICS:

The spleen has been previously dissected. The capsular surface is smooth and glistening, with no areas of disruption or hemorrhage. On cut section the parenchyma is red-brown and moderately soft, with no increase in the prominence of the Malpighian corpuscles. No areas of regional or zonal discoloration are noted, and there are no granulomata or masses.

KIDNEYS:

The right and left kidneys have been previously dissected. The cortical surfaces are smooth, with no granularity or areas of scarring. On sectioning, the cortex measures 7-8 mm. in thickness, with no pallor, petechiae, or hemorrhages. The corticomedullary junction is well demarcated with no areas of hemorrhage, inflammation, or fibrosis. There is no blunting of the renal papillae, and no papillary necrosis. No inflammatory changes are noted grossly.

There is no dilatation of calyces, pelves, or ureters, and no masses or inflammatory processes.

The bladder has been previously dissected. The mucosa is smooth and glistening, with no areas of hemorrhage, trauma, or inflammation.

GENITALIA:

The genitalia are normal adult male. There are no lesions on the penile shaft. The prostate is tan-gray and uniform, with no nodularity, and no areas of increased tissue density. The testicles are symmetrical, with no masses or atrophic changes, and no trauma.

BRAIN AND CENTRAL NERVOUS SYSTEM:

The brain has been previously dissected. There is no blood evident in the subarachnoid spaces. The meningeal surfaces are clear and glistening, with no evidence of hemorrhage or inflammatory changes.

The cerebral hemispheres are bilaterally symmetrical, with evident edema. The gyri are normally formed, showing no significant atrophic changes, and no widening of sulci or compression of gyri. There is no significant flattening of gyri or compression of sulci noted.

BRAIN AND CENTRAL NERVOUS SYSTEM (CONT'D):

The gray and white matter exhibits no hemorrhagic, inflammatory, or degenerative changes. The basal ganglia are anatomically normal, with no necrosis or degenerative changes. There is symmetry of the lateral ventricles, with no compression or enlargement. The substantia nigra exhibits normal pigmentation.

## MICROSCOPIC EXAMINATION:

ALL TISSUES EXHIBIT PROMINENT AUTOLYTIC CHANGES.

HEART:

no interstitial or replacement type fibrosis; no inflammation; no intraparenchymal hemorrhage; no necrosis; no vasculitis; no degenerative changes

SOFT TISSUES, UPPER EXTREMITIES:

edema & vascular congestion with focal areas of extravasated RBC's

SOFT TISSUES, LOWER EXTREMITIES:

edema & vascular congestion with focal areas of extravasated RBC's

LUNGS:

no inflammation in alveolar spaces or interstitial tissue; no bronchial inflammation; no atypia; moderate edema

LIVER:

no fatty metamorphosis; no acute inflammation; no necrosis or hepatocellular degeneration

SPLEEN & LYMPH NODES:

no increased circulating WBC's; no reactive germinal follicles; no atypical splenic infiltrate; no lymphoid hyperplasia in nodes and no atypia

KIDNEYS:

no glomerular, tubular or vascular lesions; no inflammation

REPRODUCTIVE:

prostate with no atypia

BRAIN:

no hemorrhage; no hypoxic or degenerative changes; no inflammation; neuronal elements preserved; no atypical features